**Marcella CSIBI, Ludovic Csibi, Aurora Csibi and Maria Csibi, Plaintiffs-Appellants,**

v.

**Gizela FUSTOS, etc., Defendants-Appellees.**

**No. 81–4100.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 14, 1981.

Decided Feb. 26, 1982.

John R. Vintilla, Cleveland, Ohio (argued), for plaintiffs-appellants; Rose M. Fanucchi, San Francisco, Cal., on brief.

Eva Voisin, San Francisco, Cal., for defendants-appellees.

Before PREGERSON and CANBY, Circuit Judges, and LUCAS,* District Judge.

LUCAS, District Judge.

This is an action involving the claims of two women, each of whom claim to be the surviving spouse of Antal Csibi, who died intestate in California in 1975. Plaintiff-appellant Marcella Csibi, who claims to be Antal's first wife, and her three children brought the instant diversity action to establish their rights in Antal's estate. The district court, prior to any discovery, ordered appellants to submit an offer of proof establishing their claims. On the basis of material submitted, the district court concluded that the appellants could not prevail and dismissed the action. Marcella and her children appealed. We hold that appellants' action is within the historic domestic relations exception to diversity jurisdiction, and therefore, that the district court lacked subject-matter jurisdiction over this dispute. The district court's order of dismissal is vacated, and the action dismissed for lack of jurisdiction.

Marcella Csibi and her three children, citizens of Rumania, filed this diversity action[1] in the United States District Court for the Northern District of California to establish their status as heirs of Antal Csibi. Marcella alleges that she married Antal Csibi in Rumania in 1946 and that her marriage was never dissolved. Antal left Rumania in 1969 and emigrated to the United States, making his home in San Francisco. Antal married Gizela Fustos in 1970 and lived with her until his death. Gizela contends that even if Antal was already married to Marcella, she is entitled to inherit his estate under California law as a good faith putative spouse.[2] Marcella argues that Gizela knew that Antal was married to another; thus, Gizela's relationship was meretricious and Gizela is not entitled to inherit Antal's property.

Approximately ten months after the suit was filed, after defendant had answered, but before any discovery was taken, the district court ordered plaintiffs to submit an offer of proof setting forth facts "from which a trier of fact could determine that plaintiffs are entitled to prevail." (R 8–9).

---

* Honorable Malcolm M. Lucas, United States District Judge, Central District of California, sitting by designation.

1. Jurisdiction was predicated on 28 U.S.C. § 1332(a)(2), which provides for diversity jurisdiction in actions between citizens of a State and citizens or subjects of a foreign state.

2. The district court applied California law without any discussion of the choice of law question in this action between Rumanian plaintiffs and a California defendant. Under California Civ.Code § 4452, a person with a good-faith belief in the validity of a void or voidable marriage is considered to be a putative spouse. Putative spouses are treated the same as legal spouses when property acquired during the relationship is divided upon annulment. By analogy, California case law holds that a putative spouse inherits all community property from a partner dying intestate just as a legal spouse would. *See Estate of Krone*, 83 Cal.App.2d 766, 189 P.2d 741 (1948). California authority is unclear, however, on the question of who inherits when a decedent leaves both a legal spouse and a putative spouse. Because our disposition of this appeal is on jurisdictional grounds, we need not reach this difficult question of state law.

Applying a complex series of presumptions found in California community property law, the district court held that the factual material submitted by appellants in response to the court's order did not sustain plaintiff's burden of disproving Gizela's putative status. The court found that Gizela was a good faith putative spouse entitled to inherit all Antal's community property. The court also found that the Csibi children had not shown that the estate contained any separate property which would descend to them under Section 221 of the California Probate Code. Therefore, the district court reasoned, Gizela was entitled to the entire estate. Appellants' action was dismissed.

■ Marcella and her children appealed, objecting to the summary disposition of their claims on the court's own motion. Neither the parties nor the district court raised the issue of whether the court lacked jurisdiction over this action due to the domestic relations exception, an historical exclusion of domestic matters formerly settled in ecclesiastical courts from federal court subject-matter jurisdiction. This court raised the issue of whether or not the domestic relations exception should be applied in this case on its own motion.[3] The parties were asked to submit further briefing on the issue.

■ The domestic relations exception arose from early judicial construction of the diversity statute now codified in 28 U.S.C. § 1332.[4] The statute, as originally enacted in 1789, conferred jurisdiction over " 'suits of a civil nature in law or in equity.' " 13 C. Wright, A. Miller, E. Cooper, Federal Practice and Procedure, § 3609 at 663 (1975). That statutory description was construed to exclude domestic relations and probate matters which were heard in ecclesiastical courts at the time the diversity statute was drafted. *Cf. Ohio ex rel. Popovici v. Agler*, 280 U.S. 379, 383–84, 50 S.Ct. 154, 155, 74 L.Ed. 489, 498 (1930) (Statute conferring exclusive jurisdiction over suits against foreign consuls was given construction similar to the diversity statute; the grant was interpreted to refer only to ordinary civil proceedings, and "not to include what formerly would have belonged to the ecclesiastical courts.")

■ The Revised Judicial Code of 1948, Act of June 25, 1948, § 1331, 62 Stat. 869 at 930, substituted the broader term "civil actions" in its description of diversity jurisdiction.[5] The domestic relations exception has persisted, however, because the courts have found it to be supported by sound policy. States have an interest in family relations

---

**3.** Lack of subject matter jurisdiction can be raised by a court's own motion at any time, and can be raised for the first time on appeal. *See, e.g., City of Kenosha v. Bruno*, 412 U.S. 507, 511–512, 93 S.Ct. 2222, 2225–26, 37 L.Ed.2d 109, 115 (1973). The Supreme Court in *City of Kenosha* stressed that it is the duty of the federal courts to assure themselves that their jurisdiction is not being exceeded.

**4.** Other jurisdictional statutes, containing grants of power over a broader range of actions, have been interpreted as including jurisdiction over domestic relations cases. The Supreme Court has twice taken jurisdiction over appeals from territorial divorce decrees under broadly worded jurisdictional statutes. *See De La Rama v. De La Rama*, 201 U.S. 303, 26 S.Ct. 485, 50 L.Ed. 765 (1906) (The statute in question permitted Supreme Court review of all final judgments and decrees of the Supreme Court of the Philippines in all actions, causes and proceedings); *Simms v. Simms*, 175 U.S. 162, 20 S.Ct. 58, 44 L.Ed. 115 (1899) (the statute in question empowered the Supreme Court to review final judgments of the highest court

of any territory.) Thus, domestic relations cases are within the Article III judicial power of the federal courts, but outside the power bestowed by Congress in the diversity statute. See analysis in *Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel*, 490 F.2d 509 (2d Cir. 1973).

**5.** The diversity statute as enacted in 1789 read:
"[T]he circuit courts shall have original cognizance, concurrent with the courts of several states, of all suits of a civil nature at common law or in equity...."
Act of Sept. 24, 1789, Sec. 11, 1 Stat. 73, 78. The statute now reads:
"(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between .... (2) citizens of a State and citizens or subjects of a foreign state...."
28 U.S.C. § 1332(a)(2).

superior to that of the federal government, and state courts have more expertise in the field of domestic relations. "Domestic relations is a field particularly suited to state regulation and control and particularly unsuited to control by federal courts." *Buechold v. Ortiz*, 401 F.2d 371, 372 (9th Cir. 1968).

As a jurisdictional limitation, the domestic relations exception has been narrowly confined. *Sutter v. Pitts*, 639 F.2d 842, 843 (1st Cir. 1981). Only those cases most closely resembling historically ecclesiastical actions have been considered absolutely outside federal court jurisdiction. These cases, at the core of the domestic relations exception, are cases where a federal court is asked to grant a divorce or annulment, determine support payments, or award custody of a child. The cases are in agreement that there is no subject-matter jurisdiction over these types of domestic disputes. *See, Cole v. Cole*, 633 F.2d 1083, 1087 (4th Cir. 1980); *Sutter v. Pitts, supra*, 639 F.2d at 843.

■ There is another class of cases also involving domestic relations which federal courts have jurisdiction over, but often refrain from adjudicating. This second class of cases consists of those where domestic relations problems are involved tangentially to other issues determinative of the case. Federal courts may exercise their discretion to abstain from deciding such cases. *See Bossom v. Bossom*, 551 F.2d 474, 475 (2d Cir. 1976) (federal courts may decline to exercise

jurisdiction over matters "on the verge" of the domestic relations exception if the interests of justice would be served by state court resolution). Cases where jurisdiction has been considered discretionary are those requesting a federal court to enforce a defaulting spouse's obligations under a state support decree, to enforce a final state divorce decree under the Full Faith and Credit clause, to invalidate a state divorce decree obtained without personal jurisdiction, to award damages in a suit between two spouses for breach of contract, and to determine the rights of spouses under federal statutes.[6]

This Circuit's test for subject-matter jurisdiction in domestic relations cases was articulated in *Buechold v. Ortiz*, 401 F.2d 371 (9th Cir. 1968). In *Buechold*, the plaintiffs were German mothers seeking to establish paternity and obtain child support from United States Armed Service members formerly stationed in Germany. The Court in *Buechold* stated that the federal courts "must decline jurisdiction of cases concerning domestic relations when the primary issue concerns the status of parent and child or husband and wife." 401 F.2d at 372. The *Buechold* "primary issue" test was formulated in a case involving paternity and child support, a type of historically ecclesiastical matter traditionally considered altogether outside federal court jurisdiction. This fact, and the use of the word "must",[7] indicate that the *Buechold* test is a test for

---

**6.** *See, e.g., Sutton v. Leib*, 342 U.S. 402, 72 S.Ct. 398, 96 L.Ed. 448 (1952) (enforcing a final divorce decree); *Williams v. North Carolina*, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945) (full faith and credit clause); *Rapoport v. Rapoport*, 416 F.2d 41, 43 (9th Cir. 1969), *cert. denied*, 397 U.S. 915, 90 S.Ct. 920, 25 L.Ed.2d 96 (1970) (state decree void for want of personal jurisdiction); *Erspan v. Badgett*, 647 F.2d 550 (5th Cir. 1981) (contract between spouses and rights of spouses under federal bankruptcy law); *Stone v. Stone*, 450 F.Supp. 919 (N.D.Cal 1978), *aff'd*, 632 F.2d 740 (9th Cir. 1980), *cert. denied*, 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981) (division of rights under a federal statute.).

**7.** The use of the word "decline" arguably conveys a sense of the court having jurisdiction

but choosing not to exercise it. Immediately preceding the "must decline" language, however, is a statement that the federal courts "*have no jurisdiction* of suits to establish paternity and child support." 401 F.2d at 372. [Emphasis added]. Immediately following the "must decline" language is a citation to *Barber v. Barber*, 62 U.S. (21 How.) 582, 16 L.Ed. 226 (1859) and other historic United States Supreme Court cases holding that there is no federal court jurisdiction whatsoever over categories of domestic relations actions. Thus, we read the "must decline" language of the *Buechold* opinion as a statement that federal courts cannot exercise jurisdiction in domestic relations cases traditionally outside federal court jurisdiction.

the limit of the federal courts' subject-matter jurisdiction, in domestic relations cases.

■ An application of the *Buechold* test to the facts of the case at bar compels the conclusion that the federal courts lack subject-matter jurisdiction over this domestic relations dispute. This case turns on a determination of the marital status of Antal Csibi, Marcella Csibi and Gizela Fustos. Marcella Csibi must establish her own status as Antal's legal spouse, and disprove Gisela's status as good faith putative spouse in order to recover. Accordingly, part of Marcella's prayer for relief is a request for an annulment of Antal's marriage to Gizela.[8] Thus, the primary issue in the instant case concerns the status of husband and wife, and federal courts lack subject-matter jurisdiction under the test announced in *Buechold.*

This case is factually similar to *Welker v. Metropolitan Life Ins. Co.*, 502 F.Supp. 268 (C.D.Cal.1980) (per Tashima, J.). In *Welker*, a woman claiming to be the putative spouse of a decedent brought an action to recover the life insurance proceeds that Metropolitan had paid to the decedent's first, legal spouse. Using the *Buechold* test, the court held that it had no jurisdiction, noting that the plaintiff sought to establish her status as putative spouse and that "all relief plaintiff seeks from this action is subsidiary to and dependent upon that status." 502 F.Supp. at 270. Similarly, in the case at bar, all recovery hinges upon a determination of marital status.

We are not persuaded by plaintiffs' assertion that there is diversity jurisdiction over this dispute because the complaint alleges a tort claim for wrongful interference with inheritance. Even if such a tort cause of action exists under the applicable law, the primary issue is still the marital status of Antal, Marcella and Gizela. If Gizela's marriage to Antal was either valid or invalid but in good faith, there could be no recovery for Marcella Csibi on either the

tort claim or under the intestacy laws. Only if appellants proved that Gizela's status was meretricious would there be further inquiry as to whether the invalid marriage was part of a scheme to deprive Marcella and her children of their inheritance.

■ Moreover, if litigants were allowed to invoke diversity jurisdiction over domestic relations cases by pleading an independent tort, the longstanding domestic relations exception to federal subject-matter jurisdiction would be completely swallowed up. For example, child and spousal support matters could come into federal court if a clever pleader alleged a claim for wrongful interference with economic advantage. An area of law formerly the "virtually exclusive province of the states" would be federalized. *See Sosna v. Iowa*, 419 U.S. 393, 404, 95 S.Ct. 553, 559, 42 L.Ed.2d 532, 543 (1975). In sum, tort allegations shall not provide a means for circumventing this important exception to federal court jurisdiction.

In holding that the district court lacked jurisdiction over the instant dispute, we are reaffirming a time-honored boundary between the domains of federal and state governments. As Justice Holmes said in *Ohio ex rel. Popovici v. Agler*, 280 U.S. 379, 383, 50 S.Ct. 154, 155, 74 L.Ed. 489, 497–98 (1930), "It has been understood that, 'the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States.'"

Because we hold that the district court lacked subject-matter jurisdiction over this action, we do not reach any question concerning the propriety of the district court's *sua sponte* summary dismissal of plaintiff's claims on the merits. Our dismissal of this case on jurisdictional grounds does not preclude trial on the merits in an appropriate forum.

---

**8.** Annulment and divorce proceedings are one of the historically ecclesiastical actions always considered to be outside the scope of the diversity statute. *See, e.g., Barber v. Barber*, 62

U.S. (21 How.), 582, 584, 16 L.Ed. 226, 227 (1859) ("We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce. . . .").