## HARRISON v. HARRISON.
### No. 6794.

United States Court of Appeals,
Fourth Circuit.

Argued June 14, 1954.

Decided July 19, 1954.

Robert C. Stackhouse and Howard I. Legum, Norfolk, Va. (Louis B. Fine, Norfolk, Va., on the brief), for appellant.

William C. Worthington, Norfolk, Va. (Worthington & White, Norfolk, Va., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Martha Harrison filed a civil action in the United States District Court for the Eastern District of Virginia against Joseph Kent Harrison, Jr., in which she sought to declare a Mexican divorce obtained by the defendant, Joseph Kent Harrison, Jr., void. She further asked the court to adopt an Ohio decree of divorce between the parties as to alimony and support money as a judgment of the District Court, and sought to require, by a judgment of the District Court, the de-

fendant to pay both the past-due monies and monies accruing in the future for alimony and support, with power to enforce payment by attachment for contempt.

The District Court denied the defendant's motion to dismiss and ordered the defendant to file his answer. The defendant filed an answer, which was followed by motions for summary judgment filed both by the plaintiff and the defendant, and the defendant's answer to the plaintiff's motion to dismiss. The District Court granted to the plaintiff the relief sought in the complaint, and defendant has appealed to us.

Martha Harrison and Joseph Kent Harrison, Jr., were married in Middletown, Ohio, on September 11, 1937. Thereafter, they lived together in Shaker Heights, a suburb of Cleveland, Ohio. One child, a boy named Joseph Kent Harrison, III, was born of the marriage. He is now fourteen years old and his custody has been awarded to his mother by the Ohio divorce court.

In January, 1951, Joseph's growing domestic difficulties with Martha came to a head. She instituted, in the Court of Common Pleas of Cuyahoga County, Ohio, a divorce suit against him, in which he was personally served with process, retained a lawyer to represent him, made a temporary alimony and support money agreement and appeared by counsel in the divorce suit in connection with the filing of this agreement.

Soon thereafter, Joseph gave up his job in Cleveland which carried an annual salary of $9,200 and went to work in Norfolk, Virginia, with an annual salary of $6,000, for a company of which Marjorie Burton was an officer and the majority stockholder. He took this substantial cut in salary despite the fact that he had experienced considerable trouble supporting his wife and child on his salary in Cleveland. Apparently, Joseph and Marjorie were frequently together and became close friends. In the meanwhile, Joseph had tried, without success, to have the divorce proceeding go through to a final disposition. The wife, it seems, had several times had the case continued.

In early November, 1951, Joseph, on full pay from his Norfolk employer, left Norfolk for Mexico, where Marjorie joined him in less than two weeks. He stayed in Mexico about six weeks. On December 10, 1951, Joseph, without personal service on Martha, obtained a divorce decree from Martha, in the First Civil Court, Bravos District, State of Chihuahua, Republic of Mexico. About three days later, Joseph and Marjorie went through a marriage ceremony in Mexico. Very shortly thereafter, he returned to Norfolk.

During the events described in the preceding paragraph, the Ohio divorce suit had been pending unadjudicated. Thereafter, Martha went ahead with the Ohio divorce and was awarded a decree of divorce in her favor wherein Joseph was found "guilty of gross neglect of duty and extreme cruelty towards plaintiff." The decree also contained the following order:

"That plaintiff recover from the defendant the sum of $10,000 as an award for alimony and for support of said minor child of the parties, for which amount judgment is hereby rendered in favor of plaintiff against defendant and upon .which judgment execution may immediately issue;

"That until the further order of the court, and commencing as of November 1, 1952, defendant pay to plaintiffs as alimony the sum of $200.00 per month plus $200.00 per month for the care and support, during his minority, of said minor child of the parties; that as to each such monthly payment the Court expressly denies to itself any reservation of the power to recall or modify any such payment after the same shall have become due and payable in accordance herewith, * * *."

The judgment covered not only the sum of $10,000 but the additional sum

of $3,400, representing the net amount of arrearages of alimony.

Joseph has paid to Martha, on current alimony and support money, not one cent since May 9, 1952, and apparently he intends to pay her nothing. He has, though, sent various sums of money to his son.

■ During the ten months which elapsed between the Mexican decree and the trial of the Ohio divorce proceeding, the Ohio court was wide open to Joseph to assert the defense of the dissolution of the marriage in Mexico. This he failed to do. Indeed, the wife presented a copy of the Mexican decree to the Ohio court and the Ohio court proceeded to grant her a divorce in the face of the Mexican decree. The dissolution of the marriage by the Ohio court in October, 1952, necessarily included an adjudication that the marriage between the parties then existed. Joseph had that fact adjudicated against him in Ohio; and it is now too late for him to relitigate the same issue of fact against Martha in Virginia. See, Patterson v. Saunders, 194 Va. 607, 74 S.E.2d 204, 208.

■ It is quite apparent, too, from the record in the instant case, particularly from Joseph's own testimony, that he never acquired a bona-fide domicile in Mexico. This Mexican divorce decree is, therefore, utterly lacking in extraterritorial validity. Williams v. North Carolina, 325 U.S. 226, 65 S.Ct. 1092, 89 L. Ed. 1577.

■ In Ohio, it seems to be well settled that alimony and support money awarded by a court of Ohio in a valid divorce suit cannot be disturbed by any subsequent divorce proceeding in a foreign court in which there is only constructive service. Melnyk v. Melnyk, Ohio Com.Pl. 107 N.E.2d 549, 50; Doerr v. Forsyte, 50 Ohio St. 726, 35 N.E. 1055; McGill v. Deming, 44 Ohio St. 645, 11 N.E. 118.

■ Appellant apparently concedes the power of the District Court to require him to pay past-due alimony, with the ordinary remedies of a judgment at law. He strenuously insists, however, that the District Court had no power to enter a decree against him for future alimony and particularly to enforce such a decree through its equitable processes acting both *in personam* and *in rem*. We think the District Judge correctly decided: "The monetary decree of this Court will be hereafter enforced through the exercise of its equity powers *in personam* as well as *in rem*." The District Judge also decreed:

"This Court will not entertain any application in the future for a modification of any payment nor in any way adjudicate its justice, leaving any change in the original decree as to future payments to the said Court of Common Pleas of Cuyahoga County, Ohio, such change to be thereafter adopted by this Court."

If, as Joseph contends, Martha were here limited to judgments at law, this would compel her to sue on each alimony payment as it became due (certainly a severe hardship) and might afford Joseph too easy an opportunity to evade executions issued on such judgments. The power of a court of equity here seems to be well established by the authorities.

As early as 1858, said Mr. Justice Wayne, in Barber v. Barber, 21 How. 582, 62 U.S. 582, 592, 16 L.Ed. 226:

"We have already shown, by many authorities, that courts of equity have a jurisdiction to interfere to enforce a decree for alimony, and, by cases decided by this court, that the jurisdiction of the courts of equity of the United States is the same as that of England, whence it is derived."

The Barber case was expressly approved in Sistare v. Sistare, 218 U.S. 1, 30 S.Ct. 682, 54 L.Ed. 905. In McKeel v. McKeel, 185 Va. 108, 116, 37 S.E.2d 746, 750, Mr. Justice Eggleston said:

"Accordingly, we conclude that a decree for alimony and support money, granted by a foreign court, may be established and enforced by and

through the equity courts of this State, with the incidental power of enforcement of such a decree by attachment for contempt."

See, also, Capell v. Capell, 164 Va. 45, 49, 178 S.E. 894, 895. See, too, Ostrander v. Ostrander, 190 Minn. 547, 252 N.W. 449; Franchier v. Gammill, 148 Miss. 723, 114 So. 813; Bruton v. Tearle, 7 Cal.2d 48, 59 P.2d 953, 106 A.L.R. 580.

This brings us to the final question in this case—whether the District Court had power to include in its decree not only past-due alimony but alimony to become due in the future under the Ohio decree. We think the District Court had this power.

Said Mr. Justice Eggleston in the McKeel case, supra, 185 Va. at page 113, 37 S.E.2d at page 749:

"But even though the courts of Virginia may not be *compelled* to do so under the full faith and credit clause of the Federal Constitution, upon principles of comity they *may* establish as their own decree a foreign decree for future payments of alimony, with the same force and effect as if it had been entered in Virginia, provided, of course, the foreign decree violates no public policy of Virginia. See Biewend v. Biewend, 17 Cal.2d 108, 109 P.2d 701, 132 A.L.R. 1264, and the annotation following it, for a full discussion and development of the subject.

"Since there is nothing in the terms of the Florida decree or in the background of the divorce suit which runs counter to the public policy of the State of Virginia, the Circuit Court of Norfolk county, upon principles of comity, had full power and authority to enter a decree based on the Florida decree requiring the payment of future installments of alimony and support money."

It is clear that there is here a real conflict in the decided cases. The older cases seemingly hold against the application of the decree to payments of alimony to become due in the future, while the later cases incline to the view that such payments may properly be included in the decree. The authorities, *pro and con*, are cited and discussed by Mr. Justice Eggleston in the McKeel case, supra.

Apart from purely technical considerations, the older and more rigid rule has little to recommend it. We prefer, as did the District Judge, the modern, liberal rule, which appears to be grounded in reason and flavored with common sense. Stated Mr. Justice Jackson, in his concurring opinion in Barber v. Barber, 1944, 323 U.S. 77, 78, 65 S.Ct. 137, 142, 89 L.Ed. 82; "The purpose of the full faith and credit clause is to lengthen the arm of the state court and to eliminate state lines as a shelter from judicial proceedings." See, also, supra, the Bruton, Ostrander and Fanchier cases.

Had Martha sued here in a court of the State of Virginia, clearly, under the McKeel case, supra, she would have obtained the relief granted to her in the instant case by the District Judge. In Guaranty Trust Co. of New York v. York, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079, Mr. Justice Frankfurter said:

"In essence, the intent of that decision [Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188] was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court. The nub of the policy that underlies Erie R. Co. v. Tompkins, is that for the same transaction the accident of a suit by a nonresident litigant in a federal court instead of in a State court a block away, should not lead to a substantially different result."

The decree of the District Court is affirmed.

Affirmed.