Eleanor Carson SPINDEL, Plaintiff,

v.

Sheldon M. SPINDEL, Defendant.

No. 67 C 693.

United States District Court
E. D. New York.

April 11, 1968.

Davis and Cox, New York City, for plaintiff, Lola S. Lea, New York City, of counsel.

Rothenberg & Atkins, New York City, for defendant, by Michael B. Atkins, New York City.

## OPINION AND ORDER

WEINSTEIN, District Judge.

Plaintiff, a resident of New Mexico, alleges that defendant, a New York resident, fraudulently induced her to marry him and then fraudulently procured a Mexican divorce dissolving their marriage. She seeks $500,000 in compensatory and punitive damages and a declaratory judgment that the Mexican divorce decree is invalid. The jurisdiction of

this Court is predicated on the diverse citizenship of the parties. 28 U.S.C. § 1332. The defendant moves to dismiss (1) for lack of jurisdiction on the grounds that the case involves "domestic relations" and that the requisite jurisdictional amount is lacking, and (2) for failure to state a claim upon which relief can be granted. For the reasons indicated below, the motion to dismiss is denied.

Plaintiff and defendant, then New York residents, married each other in 1965 in Connecticut. She alleges that she spurned marriage proposals from others relying on defendant's representations that he, a man of substantial wealth, would establish a "suitable marital home" for herself and her three children and would support them "in a manner appropriate for the * * * [family] of a man of defendant's wealth and station."

Plaintiff then learned, she tells us, that defendant married her only for the purpose of gaining economic benefits, primarily income tax advantages. After the marriage, defendant purportedly refused to live with plaintiff and her children or to support them. As a result of defendant's failure to perform, plaintiff left New York and moved to New Mexico to find other means of providing for herself and her children.

Defendant then, the complaint informs us, embarked upon a campaign to coerce plaintiff into consenting to a Mexican divorce and a disadvantageous settlement. He is alleged to have circulated libelous and scandalous charges about her and, in general, to have "engaged in a course of conduct designed to embarrass and harass her." Bowing to this pressure, on March 26, 1967, plaintiff agreed to a Mexican divorce and executed a power of attorney, furnished to her by her own counsel, authorizing an unknown Mexican lawyer to appear on her behalf in the Mexican courts. In return, defendant gave plaintiff and her attorney a total of $7,000.

Two days later, on March 28, 1967, after conferring with another lawyer, plaintiff allegedly revoked the power of attorney and immediately informed her former counsel of this action. According to plaintiff, "defendant knew or should have known of such revocation." Nevertheless, subsequent to notice of revocation, on March 31, 1967, defendant appeared before the Civil Court of the Bravos District, State of Chihuahua, Republic of Mexico, and obtained what purports to be a decree of divorce from plaintiff.

## I. JURISDICTION

Section 1332 of title 28 of the United States Code grants the district courts jurisdiction in (1) a "civil action," involving (2) a "controversy," (3) exceeding the "value of $10,000," (4) between "citizens of different states." This is a civil action; the subject matter involves fraud and powers of attorney, both of which are "common heads of equity jurisdiction." Terry v. Sharon, 131 U.S. 40, 48, 9 S.Ct. 705, 707, 33 L.Ed. 94 (1889). There is a legal dispute between the parties and the plaintiff seeks more than $10,000. The parties, even if still married, have domiciles in different states and have diverse citizenship. There would thus appear to be basis for the exercise of our diversity jurisdiction.

Nonetheless, the defendant argues, with considerable force, that the federal courts' lack of subject matter competence —jurisdiction in matrimonial cases— deprives this Court of the power to grant plaintiff any relief. To determine the validity of his contention with respect to the request for a declaration of invalidity of the Mexican divorce, we turn first to a brief review of the Supreme Court cases which are said to stand for the proposition that the defendant advances (IA1, p. 800, infra), and, second, to reasons the Supreme Court precedents are not applicable to the instant case which involves, not a request for a divorce, but a determination of the invalidity of a divorce (IA2, p. 805, infra). We then analyze defendant's suggestion that this Court lacks jurisdiction over plaintiff's tort claim (IB, p. 812,

infra). Finally, we consider whether the amount in controversy meets the statutory requirements (IC, p. 812, infra) and whether there is diversity of citizenship (ID, p. 812, infra). Having considered the jurisdictional problems, we will then turn to the question whether, under applicable New York substantive law, plaintiff has stated a claim for declaratory relief (IIA, p. 813, infra) and for damages in tort (IIB, p. 813, infra).

### A. Declaration of Invalidity of Divorce

#### 1. Supreme Court Cases on Divorce Jurisdiction

Beginning in 1859, the Supreme Court has repeatedly stated that the federal courts lack divorce jurisdiction. See Barber v. Barber, 62 U.S. (How. 21) 582, 16 L.Ed. 226 (1859); Simms v. Simms, 175 U.S. 162, 20 S.Ct. 58, 44 L.Ed. 115 (1899); De La Rama v. De La Rama, 201 U.S. 303, 26 S.Ct. 485, 50 L.Ed. 765 (1906); State of Ohio ex rel. Popovici v. Agler, 280 U.S. 379, 50 S.Ct. 154, 74 L.Ed. 489 (1930). See also In re Burrus, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500 (1890). Nevertheless, the Court has heard appeals in divorce actions from territorial courts (Simms v. Simms, 175 U.S. 162, 20 S.Ct. 58, 44 L.Ed. 115 (1899); De La Rama v. De La Rama, 201 U.S. 303, 26 S.Ct. 485, 50 L.Ed. 765 (1906)) and a similar jurisdiction has been exercised by the Court of Appeals for the District of Columbia. E. g., Bottomley v. Bottomley, 104 U.S.App.D.C. 311, 262 F.2d 23 (1958); Moncure v. Moncure, 51 App. D.C. 292, 278 F. 1005 (1922). See also Glidden Co. v. Zdanok, 370 U.S. 530, 581, n. 54, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962).

If a federal "constitutional court" (Glidden Co. v. Zdanok, 370 U.S. 530, 534, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962)) is competent to enforce policy on matrimonial status when it is laid down by a territorial legislature or Congress, there appears to be no constitutional compulsion to find lack of competence to apply analogous state substantive law in a diversity case. The Supreme Court's disclaimer of divorce jurisdiction in diversity cases thus seems predicated upon a implied limiting construction of the statute granting Federal District Courts jurisdiction in diversity cases.

The Constitution provides that all the judicial power exercisable by the sovereign power, the United States, may be granted to the District Courts by Congress. Section 1 of Article III plainly states:

> "The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." (Emphasis supplied.)

The breadth of this power is particularly evident in diversity cases, for the Constitution uses the most all encompassing language to describe this branch of jurisdiction. Section 2 of Article III provides:

> "Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." (Emphasis supplied.)

Of the three different phrases defining jurisdiction—"Cases, in Law and Equity," "Cases" and "Controversies," the last, and most general in scope, covers diversity jurisdiction. But cf. Aetna Life Ins. Co. of Hartford, Conn. v.

Haworth, 57 S.Ct. 461, 300 U.S. 227, 239, 81 L.Ed. 617 (1937). Thus, under the language of the Constitution, there need only be a controversy for a diversity case to be within the judicial power; neither a case in law or equity nor a case is required.

■ Congress, while generous, did not grant to the inferior courts it established all the power it might have granted to hear "Controversies * * * between Citizens of different States." See generally, Warren, New Light on The History of the Federal Judiciary Act of 1789, 37 Harv.L.Rev. 49, 67–69 (1923). Contra, Vestal and Foster, Implied Limitations on the Diversity Jurisdiction of Federal Courts, 41 Minn.L.Rev. 1 (1956); Wright, Federal Courts 72–73 (1963). The basic Congressional grant was not to decide "Controversies" but, rather, "suits of a civil nature at common law or in equity." See Guaranty Trust Co. of New York v. York, 326 U.S. 99, 104–105, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); Gordon v. Washington, 295 U.S. 30, 36–37, 55 S.Ct. 584, 79 L.Ed. 1282 (1935). Moreover, there was a requirement that there be a minimum sum in controversy and there was significant limiting language describing required diversity of citizenship. Cf. United Steelworkers of America, A.F.L.-C.I.O. v. R. H. Bouligny, Inc., 382 U.S. 145, 148, 86 S.Ct. 272, 274, 15 L.Ed.2d 217 (1965) (Congress expanded the diversity jurisdiction in 1875 "by deleting the requirement imposed in 1789 that one of the parties must be a citizen of the forum State"); 28 U.S.C. § 1335 (interpleader). The 1789 statute provided:

" * * * [T]he circuit courts shall have original cognizance, concurrent with the courts of the several States, of *all suits of a civil nature at common law or in equity, where the matter in dispute exceeds,* exclusive of costs, the sum or value of *five hundred dollars,* and * * * an alien is a party, or the suit is *between a citizen of the State where the suit is brought, and a citizen of another* State." Act of Sept. 24, 1789, Sec. 11, 1 Stat. 73, 78. (Emphasis supplied.)

Although the diversity statute was subsequently amended in 1948 to provide that the diversity jurisdiction shall extend to "all civil actions" (Act of June 25, 1948, Sec. 1, 62 Stat. 930, 28 U.S.C. § 1332), no substantive change in the limitation imposed by the phrase "suits * * * at common law or in equity" was intended. The change was made merely "to conform to Rule 2 of the Federal Rules of Civil Procedure." Revisor's Notes to 28 U.S.C. § 1332. Readoption and repeated amendment of the diversity statute since 1859 may be considered a sign of Congressional concurrence in the Supreme Court's construction excluding competence to grant divorces.

We turn now to *Barber* and the cases that followed.

(a) *Barber*

The Supreme Court first touched upon this question in a dictum in the 1859 case of Barber v. Barber, 62 U.S. (How. 21) 582, 16 L.Ed. 226 (1859). The Court held that the District Court of the United States for the district of Wisconsin had jurisdiction in a diversity case to entertain a suit by a wife living in New York against her husband living in Wisconsin to enforce a New York State court decree granting her a separation (divorce a mensa et thoro) and alimony. In a preliminary comment—unnecessary to its decision—the Court wrote:

"Our first remark is—and we wish it to be remembered—that this is not a suit asking the court for the allowance of alimony. That has been done by a court of competent jurisdiction. The court in Wisconsin was asked to interfere to prevent that decree from being defeated by fraud.

"*We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce,* or for the allowance of alimony, either as an original proceeding in chancery or as an incident to divorce a vinculo, or to one from bed and board." 62 U.S. (How. 21) at 584. (Emphasis supplied.)

No authority was cited for this proposition. These passing remarks constituted the Court's sole reference to the issue.

Three members of the Court dissented in *Barber* and their opinion supplied a rationale for the majority's dictum. In the course of maintaining that the district court did not have jurisdiction to enforce the state alimony award, the dissenting justices declared that since English Chancery had had no power over divorce or alimony, neither did the federal courts. They wrote:

"* * * as the jurisdiction of the Chancery in England do not extend to or embrace the subject of divorce and alimony, and as the jurisdiction of the courts of the United States in chancery is bounded by that of the chancery in England, all power or cognizance with respect to these subjects by the courts of the United States *in chancery* is equally excluded." 62 U.S. (How. 21) at 605.

This standard for determining the scope of federal jurisdiction was presumably based on a construction of the phrase "all suits of a civil nature at common law or in equity" as used in the diversity statute. Its emphasis on historical equity jurisdiction subsequently came to be accepted as the principal ground for the doctrine that the federal courts lack divorce jurisdiction. See, e. g., Ohio ex rel. Popovici v. Agler, 280 U.S. 384, 50 S.Ct. 154, 74 L.Ed. 489 (1930); Maynard v. Hill, 125 U.S. 190, 206, 8 S.Ct. 723, 727, 31 L.Ed. 654 (1888) ("When this country was settled, the power to grant a divorce * * * was exercised by the parliament of England. The ecclesiastical courts * * * were limited to the granting of divorces from bed and board. Naturally, the legislative assemblies of the colonies followed the example of parliament and treated the subject as one within their province."); cf. Fontain v. Ravenal, 58 U.S. (How. 17) 369, 392–393, 15 L.Ed. 80 (1855) (concurrence) ("chancery jurisdiction of the courts of the United States, as granted by the Constitution, extends only to cases over which the court of chancery had jurisdiction, in its judicial character as a court of equity"). See generally 2 Schouler, Marriage, Divorce, Separation and Domestic Relations, p. 1724 (6th ed. 1921) ("When the American colonies adopted the common law they did not adopt the ecclesiastical law relating to divorce, so that no American court has jurisdiction to grant divorce apart from statute, and jurisdiction over divorce is purely statutory").

It would serve no useful purpose for this Court to inquire into the historical accuracy of this position, either as regards the powers of the English Chancery or the intent of Congress in enacting the diversity statute. Since the Supreme Court has spoken, its constructive view of history constitutes a form of judicial notice that the District Courts accept as true. But cf. Terrell v. Terrell, Tothill, 61, 21 Eng.Rep. 123 (Ch. 1581) (two divorce decrees issued by chancery); 2 Howard, A History of Matrimonial Institutions, 331–349, 368–369, 371, 373 (1904) (colonial courts granted divorces and alimony); Wightman v. Wightman, 4 Johns. Ch. 343 (1820) (court of equity has power to dissolve marriage on certain grounds even in absence of statutory authorization); Ferlat v. Gojon, 1 Hopkins Ch. 478 (1825) (same); Warren, New Light on The History of The Federal Judiciary Act of 1789, 37 Harv.L.Rev. 49, 50, 59–60 (1923) (Chief Justice Oliver Ellsworth of Connecticut [whose colonial courts had had a regular divorce jurisdiction, see 2 Howard, supra, at 353–60] was the principal draftsman of the Judiciary Act of 1789, including the section dealing with diversity jurisdiction). Compare I Spence, The Equitable Jurisdiction of the Court of Chancery 702 (1850) ("not unlikely that the Court of Chancery, under its clerical chancellors, exercised jurisdiction to decree a divorce a vinculo matrimonii") *with* Macqueen, Husband and Wife 162 (3d ed. 1885).

There are several factors which suggest that use of an eighteenth century lexicon, while justified in construing the

diversity statute, is not appropriate as a constitutional doctrine. The concept of secular divorce as we know it did not exist in England; marriage was considered to be indissoluble. Church courts would only grant separation decrees (divorce a mensa et thoro). An absolute divorce could only be obtained by act of Parliament (divorce a vinculo matrimonii).

The fact that it was the legislature rather than the courts that granted divorce does not necessarily lead to the conclusion that such action was not judicial in nature. The English political structure was not congruent with that of the newly-formed federal government. Although there was a practical diffusion of governmental power, English institutions were not based on strict notions of separation of power. All authority was thought to flow from a single monarchical source. This lack of complete separation also typified much of the colonial state practice. See Frank, Historical Bases of the Federal Judicial System, 13 Law & Contemp.Prob. 3, 5 (1948) ([colonial] "courts were part of an amalgamated system of government with no regard for separation of executive, legislative, and judicial functions"). Then, as now, the British Parliament possessed what we would presently characterize as legislative, executive, and judicial functions. Thus, the British Royal Commission on Divorce was led to comment that the proceeding for securing a divorce was "in form a legislative, but in substance a judicial proceeding." 1 Report of the Royal Commission on Divorce and Matrimonial Causes, p. 12 (1912).

In this country, as the concept of separation of powers became more deeply engrained, many functions that were formerly within the legislative sphere, such as consideration of tort claims against the government or the granting of corporate charters, were assigned to judicial or administrative organs. Congress has had the power to overrule *Barber* if it wished to do so. Cf. Mayers, Ex Parte Divorce: A Proposed Federal Remedy, 54 Colum.L.R. 54, 64–65 (1954). That it has failed to take action is some evidence that the opinion eschewing power to grant divorces in diversity cases is consonant with national legislative policy.

### (b) *Simms and De La Rama*

The Supreme Court first applied its half century old *Barber* dictum in two divorce cases on appeal from territorial courts. Simms v. Simms (175 U.S. 162, 20 S.Ct. 58, 44 L.Ed. 115 (1899)) was an appeal from a decree of divorce, with an award of alimony, by the territorial supreme court of Arizona. De La Rama v. De La Rama (201 U.S. 303, 26 S.Ct. 485, 50 L.Ed. 765 (1906)) involved an appeal from the Supreme Court of The Philippines, reversing a lower court decree granting the wife a divorce, division of property, and allowance for support. In both cases the Court *said* federal courts lacked jurisdiction and then *acted* as if they possessed judicial power over divorce cases.

In *Simms,* the Court quoted *Barber* and then declared:

> "*It may therefore be assumed as indubitable* that the circuit courts of the United States have no jurisdiction, either of suits for divorce, or of claims for alimony, whether made in a suit for divorce, or by an original proceeding in equity, before a decree for such alimony in a state court. Within the states of the Union, the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the state, and not to the laws of the United States." 175 U.S. at 167, 20 S.Ct. at 60. (Emphasis supplied.)

Similar language was used by the Court in *De La Rama:*

> "*It has been a long-established rule* that the courts of the United States have no jurisdiction upon the subject of divorce, or for the allowance of alimony, either as an original proceeding in chancery, or as incident of a divorce or separation, both by reason of the fact that the husband and wife cannot usually be citizens of differ-

ent states so long as the marriage relation continues (a rule which has been somewhat relaxed in recent cases), and for the further reason that a suit for divorce in itself involves no pecuniary value." 201 U.S. at 307, 26 S.Ct. at 486. (Emphasis supplied.)

Nevertheless, in each case the Court held that it had jurisdiction to review the decision of the territorial court. In *De La Rama* the Supreme Court reviewed the evidence respecting adultery of both parties in detail and decided that the trial court was right in granting the wife a divorce.

To reach this result, the Court had to distinguish the *Barber* disclaimer of jurisdiction and explain how the territorial courts and the Supreme Court, on appeals from such courts, could hear divorce cases. As for the jurisdiction of the territorial courts, the Court's answer was based on the legislative power of Congress over the territories:

"In the territories * * * Congress * * * has full legislative power over all subjects upon which the legislature of a state might legislate within the state; and may * * * intrust that power to the legislative assembly of a territory." Simms v. Simms 175 U.S. at 168, 20 S.Ct. at 60.

See also De La Rama v. De La Rama, 201 U.S. 303, 308, 26 S.Ct. 485, 50 L.Ed. 765 (1906); Glidden Company v. Zdanok, 370 U.S. 530, 545, n. 14, 581, n. 54, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962).

In neither *Simms* nor *De La Rama* did the Court come to grips with the vital issue of the Supreme Court's jurisdiction to hear the appeal; it merely stated *Barber* did not apply. It is difficult to understand how the Court could have exercised jurisdiction if it construed *Barber* as standing for the proposition that the Constitution denies judicial power to federal courts in divorce cases. The Supreme Court is a constitutional court, having been created by Article III of the Constitution. Consequently, it can hear only those cas-

es that are within the "judicial power" within the meaning of section 2 of Article III. The fact that the Supreme Court may review the decisions of territorial courts in divorce cases would seem to suggest that such cases are not excluded from the national judicial power by the Constitution. See National Mutual Ins. Co. of District of Columbia v. Tidewater Transfer Co., 337 U.S. 582, 643, 69 S.Ct. 1173, 1208, 93 L.Ed. 1556 (1949) (dissent) ("We can no more review a legislative court's decision of a case which is not among those enumerated in Art. III than we can hear a case from a state court involving purely state law questions"); Wright, Federal Courts 73 (1963) ("Such cases [divorce cases] are apparently within the judicial power of the United States for the Supreme Court has heard appeals in divorce actions from territorial courts").

The only case other than *Barber* cited in *Simms* or *De La Rama* on this point was In re Burrus, 136 U.S. 586, 10 S.Ct. 850, 34 L.Ed. 500 (1890). In the *Burrus* case the Court had declared, again in dictum, that:

"The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States. 136 U.S. at 593–594, 10 S. Ct. at 853."

This broad disclaimer refers only to the legislative power of the federal government to lay down substantive rules of law in the domestic relations area, not to the subject matter jurisdiction—the competence—of the federal courts. As Hart and Wechsler have noted, "The *Burrus* case actually involved only the question of the power of the United States district court, under the *habeas corpus* statutes, to make an award of an infant's custody in the absence of diversity of citizenship jurisdiction. The question of power, given such jurisdiction and the requisite jurisdictional amount, was expressly reserved (136 U.S. at 597 [10 S.Ct. 850])." Hart and Wechsler, The Federal Courts and the Federal System 1017 (1953).

### (c) *Popovici*

The one case in the Supreme Court holding that there is a lack of jurisdiction to grant a divorce was not a diversity case. Ohio ex rel. Popovici v. Agler, 280 U.S. 379, 50 S.Ct. 154, 74 L. Ed. 489 (1930). This case has been termed the "most extreme case" on the question of the federal courts' divorce jurisdiction. Wright, Federal Courts, p. 73, n. 9 (1963). The wife had sued her husband, the Vice Consul of Rumania, in federal district court for a divorce, relying on section 2 of Article III of the Constitution ("judicial Power shall extend to all Cases * * * affecting * * * Consuls") and section 1351 of title 28 of the United States Code ("district courts shall have original jurisdiction * * * of all actions * * * against consuls"). The district court reluctantly dismissed, declaring:

"If the question were presented in the absence of such positive declarations by the Supreme Court of the United States, and were one of first impression, I would be inclined to the view that the case comes within the original jurisdiction of this court; but it would be presumptuous for an inferior court to announce a conclusion adverse to that clearly stated by the Supreme Court on several occasions, on the ground that the high court opinion was dicta because not necessary to a decision of the question before it, or that it was not supported by adequate legal reasons." Popovici v. Popovici, 30 F.2d 185, 186 (N.D. Ohio 1927).

The wife then brought suit in a state court. It was now the husband's turn to invoke the Constitution and section 1351. He sought a writ of prohibition to halt the state court action, contending that the federal courts had exclusive jurisdiction over cases involving consuls. The Supreme Court rejected this argument on the ground that these provisions are inapplicable since the state courts are ousted from jurisdiction only "where * * * it [has been granted] to Courts of the United States" and it "has been unquestioned for three-quarters of a century that the Courts of the United States have no jurisdiction over divorce." 280 U.S. at 383, 50 S.Ct. at 155. As authority for the latter proposition, the Court cited *Barber, Burrus, Simms* and *De La Rama,* although, as we have seen, the Court apparently held in *Simms* and *De La Rama* that divorce cases are within the judicial power and in *Burrus* reserved decision on this question.

In addition, like the dissenting justices in *Barber,* the Court also relied on historical grounds—the "common understanding" at the time the Constitution was adopted that divorces were not "ordinary civil proceedings," but "would have belonged to the ecclesiastical courts" —declaring:

"If when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States, there is no difficulty in construing the instrument accordingly and not much in dealing with the statutes. 'Suits against consuls and vice-consuls' must be taken to refer to ordinary civil proceedings and not to include what formerly would have belonged to the ecclesiastical Courts." 280 U.S. at 383–84, 50 S.Ct. at 155.

As in *Simms* and *De La Rama,* there is the curious switch in *Popovici* from legislative power—"domestic relations * * * were matters reserved to the States"— to judicial competence—"civil proceedings * * * [do] not * * * include what formerly would have belonged to the ecclesiastical Courts."

We need not, in the present case, distinguish *Popovici* for plaintiff does not seek a divorce but a ruling on the validity of a purported divorce. *Popovici's* holding does not encompass this narrower jurisdictional issue, to which we now turn.

### 2. *Power of District Courts in Matrimonial Cases Where Divorce is Not Sought*

Issues of marital status are not alien to the federal courts. See, e. g., Wolf

v. Gardner, 386 F.2d 295 (6th Cir. 1967); Rocker v. Cellebrezze, 358 F.2d 119 (2d Cir. 1966) (whether plaintiff was "wife" of insured for social security purposes); Estate of Borax v. Commissioner of Internal Revenue, 349 F.2d 666 (2d Cir. 1965), cert. denied, 383 U.S. 935, 86 S.Ct. 1064, 15 L.Ed.2d 852 (1966) (validity of divorce for tax purposes); Rodgers and Rodgers, The Disparity Between Due Process and Full Faith and Credit: The Problem of the Somewhere Wife, 67 Colum.L.Rev. 1363, 1385 (1967) ("federal courts as 'domestic relations tribunals'"); 67 Colum.L.Rev. 984, 987, n. 17 (1967).

Some lower courts have sweepingly applied the Supreme Court's dicta disowning power to grant relief in matrimonial disputes. Thus, it has been asserted that the federal courts are barred from entertaining not only actions involving matrimonial status, but also any case concerned with "domestic relations," in the broad sense of the term. See Albanese v. Richter, 161 F.2d 688 (3d Cir.), cert. denied, 332 U.S. 782, 68 S.Ct. 49, 92 L.Ed. 365 (1947) (suit by illegitimate child against putative father to invalidate agreement allegedly obtained by fraud and for support); Bercovitch v. Tanburn, 103 F.Supp. 62 (S.D.N.Y.1952) (action to recover money for necessaries supplied to wife); Linscott v. Linscott, 98 F. Supp. 802 (S.D.Iowa 1951) (action to have property settlement agreement, entered into before divorce, declared void on grounds of fraud and duress); Garberson v. Garberson, 82 F.Supp. 706 (N. D.Iowa 1949) (suit for separate maintenance); cf. Hernstadt v. Hernstadt, 373 F.2d 316 (2d Cir. 1967) (custody and visitation rights); Southard v. Southard, 305 F.2d 730, 731 (2d Cir. 1962) (matrimonial "actions may not be entertained in federal courts"). See also 1 Barron and Holtzoff, Federal Practice and Procedure, p. 214 (Wright ed. 1960) ("The lower courts have applied the principle more broadly, however, and will not take jurisdiction of cases which can be labelled as 'domestic relations' cases even where only property rights are involved").

■ This broad interpretation is unwarranted by the Constitution, any statute, holding of the Supreme Court or current jurisdictional theory and we decline to follow it. Even if the federal courts lack jurisdiction to grant a divorce, "[t]his does not necessarily mean * * * that they lack jurisdiction to determine * * * the validity of a divorce decree rendered by * * * a foreign court * * * provided there is some jurisdictional basis, such as diversity." 6A Moore, Federal Practice ¶57.21[2] at pp. 3125–3126.

The position against expansive reading of Supreme Court dicta is buttressed by: (a) the historical jurisdiction of the English Chancery, (b) the holding and much of the discussion in Barber v. Barber, and (c) a long line of federal cases.

### (a) *Historical Grounds Mentioned by Supreme Court*

The historical reasons relied upon to explain the federal courts' complete lack of matrimonial jurisdiction are not convincing. Colonial courts and the English Chancery were not without power in matrimonial affairs. Even in *Barber* the Supreme Court had referred to "the belief" that existed at the time the Constitution was adopted that the power to decree alimony "belonged to the high court of chancery, in the absence of ecclesiastical tribunals"; it cited, seemingly with approval, several early state cases which held that a court of equity had the "inherent jurisdiction to decree alimony." Barber v. Barber, 62 U.S. (How. 21) at 597, 16 L.Ed.2d 226. See also 2 Howard, A History of Matrimonial Institutions, 331–349, 368–369, 371, 373 (1904) (colonial courts granted divorces and alimony); Wightman v. Wightman, 4 Johns.Ch. 343 (N.Y.1820) (court of equity has power to declare marriage dissolved if void from the beginning even in absence of statutory authorization); Ferlat v. Gojon, 1 Hopkins Ch. 478 (N.Y.1825) (same).

Prior to 1789, the validity of a foreign divorce seemingly had not been litigated in the English courts. The question was treated as one of first instance by the Court of Common Pleas sitting en banc in an 1812 case involving a criminal prosecution for bigamy; the Court held that a foreign divorce cannot dissolve an English marriage. Lolley's Case, 2 Clark and Fin. 567, 6 Eng.Rep. 1268 (C.P. 1812). Cf. Sinclair v. Sinclair, 1 Hag. Con. 294, 161 Eng.Rep. 557 (Consistory Ct. London 1798) (dictum: foreign divorce of state in which marriage contracted entitled to "considerable weight"). Subsequently, the Court of Chancery followed this ruling in a case concerning the disposition of the accrued arrears of an annuity under a marriage settlement. M'Carthy v. DeCaix, 2 Russ. & M. 614, 39 Eng.Rep. 528 (Ch.1831). See also Tovey v. Lindsay, 1 Dow. 117, 3 Eng.Rep. 643 (H. of Lords 1813). But cf. Warrender v. Warrender, 2 Clark & Fin. 488, 6 Eng.Rep. 1239 (H. of Lords 1835) (on appeal from decision by court of Scotland, distinguished *Lolley's* Case).

The temporal courts in England always exercised jurisdiction in a broad range of ancillary matters. Spiritual authority was only "theoretically exclusive." Goebel, Cases and Materials on the Development of Legal Institutions, 490 (1946).

First, the courts decided questions of status incidental to the exercise of their established jurisdiction. As one early nineteenth century commentator put the matter:

"Questions as to the validity of marriages depending upon civil disabilities, and the provisions in the marriage acts, arise in a great variety of cases before other judicial tribunals, as committees of privileges in the house of lords—in suits in courts of equity—in the common law courts, in a great variety of actions—in criminal courts upon charges of bigamy—and in the inferior courts of quarter sessions upon cases of settlement of paupers.

\* \* \* \* \* \*

The temporal courts have the sole cognizance of examining and deciding directly upon all the temporal rights of property; and so far as such rights are concerned, they have the inherent power of deciding incidentally, either upon the fact, or the legality of marriage when the question occurs in the trial, and as a part of some other more general issue coming within the sphere of temporal jurisdiction. In the decision of the proper objects of their jurisdiction, they do not want or require the aid of the spiritual courts." Shelford, The Law of Marriage and Divorce, p. 260 (1841).

See also, e. g., Ilderton v. Ilderton, 2 H. Bl. 145, 162, 126 Eng.Rep. 476, 485 (C.P. 1793) (the question of the validity of a marriage in Scotland "arising incidentally in a suit in dower" may be tried by jury); Wybourn v. Blount, 1 Dickens 155, 21 Eng.Rep. 228 (Ch. 1751) (suit to establish will; question whether beneficiary lawfully married); Wigmore's Case, 2 Salkeld 438, 91 Eng.Rep. 380 (K. B.1706) (Anabaptists married according to rites of own religion; held valid marriage; spiritual court cannot prosecute for fornication); Basset v. Morgan, 1 Lev. 41, 83 Eng.Rep. 287 (K.B.1661) (action on a debt to be repaid when plaintiff marries; defense is plaintiff not lawfully married); Pride v. Earl of Bath, 3 Lev. 410, 83 Eng.Rep. 755 (K.B.1700) (question of whether heir is legitimate); Bury's Case, 5 Coke 98b, 77 Eng.Rep. 207 (C.P.1598) (question whether children of husband's second marriage are legitimate; "admitting the second marriage was voidable [causa frigiditatis], yet it remains a marriage until it is dissolved"); Tarry v. Browne, 1 Sid. 65, 82 Eng.Rep. 972 (K.B.1661) ("si le marriage ad estre per force duresse del feme donque ad estre void trespas bien gist"); Anonymous, Skinner 119, 90 Eng.Rep. 56 (K.B.1683) (suit for damages for fraud in inducing a marriage; defendant found to have already been married); Roach v. Garvan, 1 Ves.Sen. 157, 27 Eng.Rep. 954 (Ch. 1748) (ward of court marries in France; findings of French court, having proper jurisdiction, that marriage was valid, is conclusive); Latour v. Tees-

dale, 8 Taunt. 832, 129 Eng.Rep. 606 (C. P.1816) (will provides that if beneficiary marries without consent of trustees before she becomes 24 years old, she will forfeit her share of estate; question whether beneficiary was lawfully married in East Indies); Lacon v. Higgins, 3 Stark. 178, 171 Eng.Rep. 813 (K.B. 1822) (suit for price of goods sold; question whether defendant was husband of purchaser; court determines whether defendant's marriage in France was valid and legal under French law); 2 Pollock and Maitland, History of English Law, p. 380 (2d ed. 1899) (in possessory actions "the temporal court gives * * * judgment[s] touching the validity of a marriage"); 1 Coke, First Institute of the Laws of England, p. 660, n. (c) (1st Amer. ed. 1827) ("where the marriage is actually void, the courts of common law are competent in jurisdiction to submit the trial of the fact to a jury"); 6 Comyns, A Digest of the Laws of England, p. 411 (5th ed. 1822) (widow seeks to claim tenant's land as part of her dower; "tenant may plead *ne unques accouple* in lawful matrimony"); 2 Newland's Chancery Practice, p. 212 (3d ed. 1830) (in suit instituted by husband to enforce rights of wife, defendant may plead husband not lawfully married).

Second, chancery gave the ecclesiastical courts substantial assistance in matters involving matrimonial status. See, e. g., Brocker v. Hamilton, 1 Dickens 154, 21 Eng.Rep. 228 (Ch.1751) (writ of ne exeat regno can be granted to prevent husband from going abroad to avoid payment of alimony); Ex parte Whitmore, 1 Dickens 143, 21 Eng.Rep. 223 (Ch. 1750) (same); Dickenson v. Mavie, 1 Dickens 582, 21 Eng.Rep. 397 (Ch. 1771) (defendant ordered to pay plaintiff 500 pounds to enable her to prosecute a suit for jacitation of marriage in spiritual courts); Heyn's Case, 2 V. & B. 182, 35 Eng.Rep. 288 (Ch. 1813) (husband attempts to take wife away by force and threatens to harm her after she institutes suit for divorce; writ of supplicavit granted). See also Shelford, The Law of Marriage and Divorce, p. 405

(1841); 2 Story, Equity Jurisprudence pp. 683, 733–34 (10th ed. 1870); 2 Roper, A Treatise of the Law of Property Arising from the Relation Between Husband and Wife, p. 317 (2d ed. 1826).

Third, Chancery would, in effect, function as a "domestic relations tribunal" if some independent basis for the exercise of its jurisdiction was present. Thus, equity would: [a] enforce separation agreements (e. g., Angier v. Angier, Gilb. Rep. 153, 25 Eng.Rep. 107 (Ch.1718) (court enforces agreement to pay separate maintenance); Head v. Head, 3 Atk. 295, 26 Eng.Rep. 972 (Ch. 1745) (same)); [b] hold the husband liable for his wife's debts incurred in purchasing "necessaries" (e. g., Shelford, The Law of Marriage and Divorce, p. 109, n. (c) (1841) ("The rule is thus laid down * * * 'If a man without any justifiable cause turns away his wife, he is bound by any contract she may make, for necessaries suitable to her degree and estate'")); and [c] decree separate maintenance to a wife out of a trust fund set up in her behalf, out of her own funds, out of her husband's trust estate after she has obtained a divorce in the ecclesiastical courts, and incident to the issuance of a writ of supplicavit. See, e. g., Ball v. Montgomery, 2 Ves.Jun. 191, 34 Eng.Rep. 774 (Ch.1793); Bond v. Simmons, 3 Atk. 20, 26 Eng.Rep. 815 (Ch.1743); Oxenden v. Oxenden, 2 Vern. 493, 23 Eng.Rep. 916 (Ch.1705); Fleshward v. Jackson, Tothill 94, 21 Eng.Rep. 133 (Ch. 1623) ("money given to a feme covert for her maintenance, because her husband is an unthrift"); II Comyns, Digest of the Laws of England, p. 132 (1780); I Fonblanque, A Treatise of Equity, p. 99 (1835); Clancy, Husband and Wife, pp. 455, 551 (2d Amer. ed. 1837); 2 Story, Equity Jurisprudence, pp. 683, 733–34 (10th ed. 1870); 1 Roper, Treatise of the Law of Property Arising From the Relation Between Husband and Wife, pp. 278–79, 284 (2d ed. 1826). Preliminary to the granting of such relief, the court would make a factual inquiry into the conduct of the parties; if

the wife was found to be at fault, relief would be denied. See, e. g., Ball v. Montgomery, 2 Ves.Jun. 191, 34 Eng.Rep. 774 (Ch.1793) ("Where, on the other hand, the wife has been the culpable party, the Court will not be disposed to make any order for her maintenance"); Shelford, The Law of Marriage and Divorce, p. 388 (1841) (husband not liable for wife's necessaries "where he has turned her away for adultery").

Finally, the temporal courts would restrain the church tribunals from exceeding their jurisdiction. See, e. g., Man's Case, Cro.Eliz. 228, 78 Eng.Rep. 484 (K. B.1591) (headnote: "If the Spiritual Court impeach a marriage without the Levitical degrees, a prohibition lies"); Harrison v. Burwell, Vaugh. 206, 124 Eng.Rep. 1039 (C.P. 1667) (same); Wigmore's Case, 2 Salk. 438, 91 Eng.Rep. 380 (Ch.1706) (valid marriage; spiritual court cannot punish for fornication); Ex Parte Turing, 1 V. & B. 140, 35 Eng. Rep. 55 (Ch.1812) (statute declares marriage of insane person void, sentence of ecclesiastical court not necessary); Shelford, The Law of Marriage and Divorce, p. 262 (1841); cf. Hecht, recent Developments Concerning Jurisdiction in Matters of Personal Status, 2 Israel L.Rev. 488, 490 (1967) (in Israel, where there is strict duality of jurisdiction, civil courts have jurisdiction to examine jurisdiction of religious courts).

### (b) *Supreme Court Discussion*

A close reading of *Barber* indicates that the Supreme Court recognized the distinction between the power to grant a divorce and the power to decide whether a divorce was valid. It rejected the dissent's position (62 U.S. (How. 21) at 602) that all aspects of domestic relations were within the exclusive jurisdiction of the state courts and carefully avoided placing a blanket prohibition upon the exercise of federal jurisdiction in this area.

After reciting the circumstances surrounding the New York divorce decree which the plaintiff was seeking to enforce, the Court stated:

"It also appears, from the record, that the defendant had made his application to the court in Wisconsin for a divorce *a vinculo* from Mrs. Barber, without having disclosed to that court any of the circumstances of the divorce case in New York; and that, contrary to the truth, verified by that record, he asks for the divorce on account of his wife having wilfully abandoned him. *It is not necessary for us to pass any opinion upon the legality of the decree, or upon its operation there or elsewhere to dissolve the vinculum of the marriage between the defendant and Mrs. Barber.*" 62 U.S. (How. 21) at 588. (Emphasis supplied.)

The implication of the majority opinion is that, had it been necessary to do so, the federal courts could properly have passed on the validity of the New York decree. This proposition would seem almost self-evident since, if the New York decree were void, it would have been improper to give it legal effect in Wisconsin.

In addition, the Court adverted to the competence of the English Chancery to aid the ecclesiastical courts in the exercise of their jurisdiction in matrimonial matters:

"There is, too, another ground of jurisdiction in equity, just as certainly established as that is of which we have just spoken. It comprehends that case before us. It is, that courts of equity will interfere to compel the payment of alimony which has been decreed to a wife by the ecclesiastical court in England. Such a jurisdiction is ancient there, and the principal reason for its exercise is equally applicable to the courts of equity in the United States. It is, that when a court of competent jurisdiction over the subject-matter and the parties decrees a divorce, and alimony to the wife as its incident, and is unable of itself to enforce the decree summarily upon the husband, that courts of equity will interfere to prevent the decree from being defeated by fraud." 62 U.S. (How. 21) at 590–91.

*(c) Federal Lower Court Precedents*

Despite occasional extravagant disclaimers, it has long been recognized that the federal courts are competent to determine matters involving some aspects of marital status, either directly or indirectly. The fact that, incidental to the exercise of federal jurisdiction, there is an impact or effect on a matter which is cognizable in the state courts cannot divest the federal court of its power. See, e. g., Terry v. Sharon, 131 U.S. 40, 9 S. Ct. 705, 33 L.Ed. 94 (1888) (bill of revivor in suit to find written declaration of marriage a nullity because a forged instrument; *"prima facie* case of jurisdiction"); Harrison v. Harrison, 214 F. 2d 571 (4th Cir. 1954), cert. denied, 348 U.S. 896, 75 S.Ct. 217, 99 L.Ed. 704 (1954) (action to declare Mexican divorce invalid; future alimony based on Ohio divorce decreed); Walterman v. Taylor, 168 F.2d 413 (2d Cir. 1948) (per curiam) (record on appeal impounded; described in 6A, Moore, Federal Practice at p. 3125 as a suit by plaintiff "for a declaration that she was the illegitimate child of the defendant"); Cohen v. Randall, 137 F.2d 441 (2d Cir.), cert. denied, 320 U.S. 796, 64 S.Ct. 263, 88 L.Ed. 480 (1943) (diversity action to recover damages for alleged fraudulent representations made by former spouse which induced plaintiff to enter into a separation agreement and obtain a divorce); Oxley v. Sweetland, 94 F.2d 33, 35 (4th Cir. 1938) (question whether plaintiff had married deceased in action to recover personal property; "The fact of marriage is a necessary issue in this suit * * *; but the purpose of the suit is, not to establish the marriage, but to determine the right to the property claimed"); Barnett v. United States, 82 F.2d 765, 769 (9th Cir.), cert. denied, 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402 (1936) (government seeks to have ward's marriage declared void; "the remedy sought * * * was ancillary to the main purpose of this action"); McNeil v. McNeil, 78 F. 834 (N.D.Cal.1897), aff'd, 170 F. 289 (9th Cir. 1909) (suit to have judgment of divorce declared void by reason of fraud); Bowman v. Bowman, 30 F. 849 (N.D.Ill.1887) (divorce action in state court; defendant claims he never married plaintiff and removes to federal court; action remanded for lack of subject matter jurisdiction over divorce, but court indicates it would have jurisdiction over defendant's claim standing alone); Sharon v. Hill, 20 F. 1 (D.Cal.1884) (discussed infra); Abdul-Rahman Omar Adra v. Clift, 195 F.Supp. 857, 865 (D.D. C.1961) (custody; jurisdiction based on 28 U.S.C. § 1350 covering action by alien for tort); 6A Moore, Federal Practice ¶57.21[2] (declaratory action to determine validity of divorce "is sufficiently akin to an equitable action, such as a bill quia timet, that jurisdiction over the declaratory action is not precluded by the doctrine that regular federal jurisdiction does not include divorce jurisdiction"); 48 Colum.L.Rev. 154 (1948). Cf. Barrett v. Failing, 111 U.S. 523, 4 S.Ct. 598, 28 L.Ed. 505 (1884) (valid divorce bars dower interest); Holm v. Shilensky, 388 F.2d 54 (2d Cir. 1968) (fraud in inducing plaintiff to agree to property settlement incorporated into divorce decree); Block v. Block, 196 F.2d 930 (7th Cir. 1952) (fraud in property settlement portions of divorce decree); Schoonover v. Schoonover, 172 F.2d 526 (10th Cir. 1949) (same); Hastings v. Douglass, 249 F. 378 (N.D.W.Va. 1918) (suit by heirs to annul deceased's marriage).

Thus, in Sharon v. Hill, 20 F. 1 (D.Cal. 1884) the circuit court entertained "a suit in equity to declare null and void, and to cancel, an instrument claimed to be a contract of marriage * * * said contract being claimed to be a forgery." 20 Fed. at 1. Jurisdiction was predicated on the diverse citizenship of the parties. When the case reached the Supreme Court in a subsequent proceeding, Terry v. Sharon, 131 U.S. 40, 9 S.Ct. 705, 33 L. Ed. 94 (1889), the Court commented:

> "if the jurisdiction of the circuit court in the original suit were in any respect open to question on this appeal or on this motion, we think that the record below presents so much of the elements

of jurisdiction as to need no further inquiry in that direction in this proceeding. It appears by the record that Sharon, the plaintiff in that suit, describes himself as a citizen of the state of Nevada, and the defendant Hill as a citizen of the state of California. This is sufficient to have given jurisdiction of the parties, and the object of the suit, the cancellation of a forged instrument, is one of the common heads of equity jurisdiction. * * * it is at least a prima facie case of jurisdiction as between the parties * * *." 131 U.S. at 48–49, 9 S.Ct. at 707.

Similarly, in McNeil v. McNeil, 78 F. 834 (N.D.Cal.1897), in which a judgment was sought to annul a divorce decree allegedly procured by fraud, a case virtually on all fours with the present action, the court distinguished *Barber,* declaring:

"Here there is no question if parties may be divorced or must forever remain together,—no question of the grounds of divorce. It is a question purely of chancery jurisdiction. For what the judgment was rendered is not essential. It is that it was obtained by fraud, and hence unjust to hold and use, and, because it is, the court has jurisdiction." 78 F. at 835.

See also Cohen v. Randall, 137 F.2d 441, 445 (2d Cir.), cert. denied, 320 U.S. 796, 64 S.Ct. 263, 88 L.Ed. 480 (1943) (intimating that a "completely void divorce" granted by a "Mexican decree" could be declared invalid by the district court).

### 3. *Doctrine of Abstention*

Several recent cases have suggested that, although the power to act in some matrimonial controversies is present, the federal courts should abstain from exercising their diversity jurisdiction, since "[s]tate courts have undoubted competence and wide experience in dealing with cases [involving domestic relations.]" Brandtscheit v. Britton, 239 F. Supp. 652, 654 (N.D.Cal.1965) (establish paternity and for support); In re Freiberg, 262 F.Supp. 482, 484 (E.D.La. 1967) (adoption); Abdul-Rahman Omar

Adra v. Clift, 195 F.Supp. 857, 865 (D. Md.1961) (custody); cf. Slapin v. Slapin, 352 F.2d 55, 56 (6th Cir. 1965) (dissent) (cost of providing care to indigent parent).

There appears to be no ground for application of a generalized doctrine of abstention in matrimonial cases. As this Court recently stated in Lerner v. Town of Islip—a case dealing with zoning and federal question jurisdiction— (272 F.Supp. 664 (E.D.N.Y.1967)):

"A federal court may not surrender its jurisdiction once it is properly invoked '[i]n the absence of some recognized public policy or defined principle guiding the exercise of the jurisdiction conferred, which would in exceptional cases warrant its non-exercise.' Meredith v. City of Winter Haven, 320 U.S. 228, 234, [64 S.Ct. 7, 11, 88 L.Ed. 9] (1943). Unless this case falls within some recognized exception, therefore, the federal court must retain jurisdiction * * *." 272 F.Supp. at 666.

No "recognized exception" is present in this case. There can be no question of interference with state policy for, under *Erie,* we are asked to do exactly what a state court would do. The mere fact that a matter is one which has traditionally been of state concern is not sufficient to justify abstention. See, e. g., Lerner v. Town of Islip, 272 F.Supp. 664 (E.D.N.Y.1967) (zoning). Whether a remedy is provided in a federal or state forum is irrelevant. "[T]he basic premise of federal jurisdiction based upon diversity * * * is that the federal courts should afford remedies which are coextensive with rights created by state law and enforceable in state courts." Burford v. Sun Oil Co., 319 U.S. 315, 336–337, 63 S.Ct. 1098, 1109, 87 L.Ed. 1424 (1943) (Frankfurter, J., dissenting).

It has also been suggested that federal courts ought not to exercise jurisdiction in matrimonial matters because "a unitary administration of the law is indispensible." Hart, Jr., The Relations Between State and Federal

Law, 54 Colum.L.Rev. 489, 509 (1954). Even were such a choice a matter for judges rather than Congress, the argument seems particularly inappropriate where the issue is whether marital status has been terminated by a void foreign decree. There is no reason to suspect that different federal judges will apply state divorce policy any more divergently than different state judges. See, e. g., Note, Annulments for Fraud—New York's Answer to Reno?, 48 Colum.L. Rev. 900, 911–916 (1948).

### B. *Tort Claims*

■ Plaintiff is also seeking damages on two tort theories based on defendant's alleged fraud in inducing her to marry and in procuring the Mexican divorce. There can be little doubt that this Court has jurisdiction to entertain such claims. A federal court is not deprived of competence merely because the parties involved are husband and wife or the controversy might be termed a "marital dispute." Compare Daily v. Parker, 152 F.2d 174, 162 A.L.R. 819 (7th Cir. 1945) (tort suit by children against their father's mistress for alienation of affections and enticement from home); Cohen v. Randall, 137 F.2d 441 (2d Cir.), cert. denied, 320 U.S. 776, 64 S.Ct. 263, 88 L. Ed. 480 (1943) (suit to recover damages for fraud in inducing plaintiff to enter into separation agreement and obtain divorce); Abdul-Rahman Omar Adra v. Clift, 195 F.Supp. 857 (D.D.C.1961) (suit for child custody; "unlawful taking * * * of a minor child from the custody of the parent * * * is a tort") with Albanese v. Richter, 161 F.2d 688 (3d Cir.), cert. denied, 332 U.S. 782, 68 S.Ct. 49, 92 L.Ed. 365 (1947) (illegitimate child sues putative father to invalidate allegedly fraudulent agreement negating right to his support).

If a woman were suing her former husband for assault and battery in federal district court, no one would question the court's power to award the plaintiff damages. No meaningful distinction can be drawn between this hypothetical situation and the instant case. Both involve tort claims actionable under state law. Only damages are being sought and the marital status of the parties will not be altered by an adjudication of these tort claims on the merits. In fact, as regards the action for fraud in procuring the divorce decree, it may be that under New York law plaintiff can be awarded damages only if she succeeds in having the decree invalidated. See, e. g., Mahler v. Mahler, 173 Misc. 214, 17 N.Y. S.2d 502 (Sup.Ct.1939).

### C. *Amount in Controversy*

■ Under the circumstances of this case we need not reach the question whether a marriage is a res capable of valuation. Cf. N.Y. Domestic Relations Law, McKinney's Consol.Laws, c. 14, § 32(1) (husband liable for support of wife); see also Vestal and Foster, Implied Limitations On The Diversity Jurisdiction of Federal Courts, 41 Minn.L. Rev. 1, 28 (1956) ("As for the jurisdictional amount in divorce cases, certainly a persuasive argument can be made that a sufficient amount might be involved."). Since plaintiff is seeking damages substantially in excess of $10,000 in her tort actions based on defendant's fraud, the jurisdictional amount requirement is satisfied.

### D. *Diversity*

■ The final prerequisite for the maintenance of this action in a federal district court—that the parties be of diverse citizenship—is also met. Plaintiff alleges that she is presently a resident of New Mexico and that the defendant is a citizen of New York. Even if plaintiff were to prevail on the merits and secure the declaratory judgment she is seeking, diversity would not be impaired. Williamson v. Osenton, 232 U.S. 619, 34 S.Ct. 442, 58 L.Ed. 758 (1914) (diversity action by wife against husband's mistress). See earlier intimations to this effect in Barber v. Barber, 62 U.S. (How. 21) 582, 592–595, 599–600, 16 L.Ed. 226 (1859). There is "no reason why the wife * * * should not have the same choice of domicile for an action for damages that she has against her husband for a divorce."

Williamson v. Osenton, 232 U.S. at 625, 34 S.Ct. at 443.

▇▇▇▇▇ Whatever the ancient doctrine, a wife is capable of acquiring a domicile separate from that of her husband; at least to this extent legal equality of the sexes is embodied in the Fourteenth and Nineteenth Amendments. Cf. 42 U.S.C. §§ 2000a et seq. "If there has been an actual rupture of marital relations, [a wife] * * * may acquire a separate domicile of her own even though she was the party at fault. And she may likewise do so if for any reason she is living apart from her husband even though her relations with him are wholly amicable." Restatement 2d, Conflict of Laws § 21, comment d (Proposed Official Draft, Part I, 1967). See also cases collected, id., Reporter's Notes, pp. 111–12; Goodrich and Scoles, Conflict of Laws, pp. 51–53 (4th ed. 1964) ("The more recent authorities now recognize the separate domicile of the wife whenever she in fact makes her home apart from her husband, regardless of her motive or propriety of her conduct.").

## II. SUBSTANTIVE VALIDITY OF CLAIMS

### A. Declaratory Relief

▇▇▇▇▇ Plaintiff states a claim for declaratory relief. It is established that a unilateral Mexican divorce obtained under the circumstances described in the complaint is invalid under New York law. See, e. g. Rosenbaum v. Rosenbaum, 309 N.Y. 371, 376, 130 N.E.2d 902, 904, 54 A.L.R.2d 1232 (1955) (Mexican divorce by nonresident obtained without appearance of spouse is "a clear legal nullity" and action for declaratory judgment to declare it void lies). Cf. Rosenstiel v. Rosenstiel, 16 N.Y.2d 64, 72, 262 N.Y.S. 2d 86, 87, 209 N.E.2d 709, 13 A.L.R.3d 1401 (1965). Plaintiff alleges that she signed the power of attorney authorizing a Mexican lawyer to appear on her behalf under duress and then "withdrew and revoked" it prior to its exercise. She purportedly notified her former attorney—who had supplied her with the power of attorney form—of her action and she alleges that the "defendant knew or

should have known of such revocation." She could not have communicated the fact of revocation directly to the Mexican lawyer because he was unknown to her. Since, on a motion to dismiss for failure to state a claim for relief, the court must give the pleader every reasonable benefit of potential proof and plausible inference, the allegations of the complaint are sufficient to give rise to the inference that the power of attorney was effectively revoked prior to its exercise. Cf. Restatement 2d, Agency § 134, comment c (principal may notify agent of termination of authority by giving notification to an agent of the agent). Consequently, any appearance on plaintiff's behalf by the Mexican lawyer named in the power of attorney would be unauthorized and the divorce obtained by defendant could be found to have been invalid by the New York courts.

### B. Tortious Injury

▇▇▇▇▇ Plaintiff states a cause of action for fraud in inducing her to marry defendant. Her complaint sets forth all the requisite elements of a claim of fraud—false representations, scienter, reliance, injury. Under New York law, it has long been established that fraud in inducing a person to enter into marriage is actionable. See, e. g., Leventhal v. Lieberman, 262 N.Y. 209, 186 N.E. 675, 88 A.L.R. 782 (1933) (action by divorcee against former in-laws); Kujek v. Goldman, 150 N.Y. 176, 44 N.E. 773, 34 L.R. A. 156 (1896) (action against third party for inducing marriage); Damages for Fraud Inducing Marriage and Declarations of Trust, N.Y. Law Journal, June 19, 20, 21, 1956, p. 4, col. 1. Cf. Tuck v. Tuck, 14 N.Y.2d 341, 251 N.Y.S.2d 653, 200 N.E.2d 554 (1964) (sham marriage ceremony; "wife" has cause of action for fraud against "husband"). Such an action may be maintained by one spouse against the other, whether they are still married or have been divorced. See, e. g., Becker v. Becker, 207 Misc. 17, 138 N. Y.S.2d 397 (Sup.Ct.1954); Risikoff v. Risikoff, 120 N.Y.S.2d 776, 777–778 (Sup.Ct.1953) (dictum); Saunders v. Saunders, 63 N.Y.S.2d 880, 882 (Sup.Ct. 1946); Amsterdam v. Amsterdam, 56 N.

Y.S.2d 19 (Sup.Ct.1945) (action for damages and to declare marriage void); cf. N.Y. General Obligations Law, McKinney's Consol. Laws, c. 24–A, § 3–313.

The plaintiff may seek both a declaration that the judgment is void and damages resulting from the procurement of the fraudulent judgment. N.Y.CPLR § 3002(e). We need not consider whether, were the divorce decree rendered in another state, full faith and credit would mandate that plaintiff seek invalidation as a prerequisite to obtaining monetary relief for her damage. See Mahler v. Mahler, 173 Misc. 214, 17 N.Y.S.2d 502, (Sup.Ct.1939) (court will not grant damages for fraud until divorce granted in another state has been set aside). See also Cohen v. Randall, 137 F.2d 441 (2d Cir.), cert. denied, 320 U.S. 796, 64 S.Ct. 263, 88 L.Ed. 480 (1943).

The motion to dismiss is in all respects denied.

So ordered.